**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TIM FERGUSON,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 12-961 (BJR)** |
| **JOHN M. MCHUGH,** Secretary of the Army, | **MEMORANDUM OPINION** |
| **Defendant.** | |

This case is before the court on Defendant's Motion to Dismiss and Motions for Summary Judgment from both parties. Plaintiff Tim Ferguson seeks review of a decision by the Army Board of Corrections for Military Records ("ABCMR" or "Board"). The Board denied Ferguson's application to change his record from a discharge in lieu of court-martial to a medical retirement. Having reviewed the briefs and the administrative record, the Court grants Defendant's motion for summary judgment, for the reasons discussed below.

**I.     Background**

**A.  Voluntary Discharge in Lieu of Court-Martial**

Army regulations provide that a service member may request discharge in lieu of court-martial where the service member faces a trial by court-martial in which a punitive discharge can be adjudged. Army Reg. 635-200, ¶ 10-1. This is known as a "Chapter 10" discharge request. The regulation prohibits coercion of such requests. *Id.* ¶ 10-2.

**B.  Ferguson's Hospitalization and Discharge**

Ferguson enlisted in the U.S. Army on July 24, 1978. AR 128. In early 1991 Ferguson's commander began an investigation of Ferguson in response to sexual harassment complaints by

Ferguson's subordinates. AR 615, 727. The investigation uncovered sufficient evidence for Ferguson to be charged, and Ferguson was relieved of duties. AR 599. Between December 1991 and January 1992, Ferguson was charged with misappropriation of government property, sexual harassment, and adultery. AR 26; Defendant's Statement of Undisputed Facts (SUF) ¶ 9.

On January 14, 1992, Ferguson was voluntarily admitted to the hospital for psychiatric evaluation. SUF ¶ 14. The admitting attendant described Ferguson's thought process as "intact," and his mental status as "alert." AR 406. The records indicate that Ferguson remained cooperative and alert throughout the hospitalization, which lasted until January 17, 1992. AR 377-79.

The nurse's notes from January 14, 1992 describe Ferguson as "very angry" on admission to the hospital, and "paranoid." AR 376-77. Ferguson admitted to feeling depressed and vaguely suicidal, though he denied having any current suicidal thoughts. AR 377-78. Ferguson stated: "My lawyer wants me to take a Chapter 10. I don't want to take it for something I didn't do." AR 377. He further stated that he "will not let 14 yrs of service go in vain." AR 378.

Progress notes from Ferguson's clinical psychologist indicate that the hospital staff spoke with Ferguson's attorney on January 15, 1992 and made an appointment for the attorney. AR 395. In a group session, Ferguson "discussed charges he's facing [and] his innocence." AR 395. A January 16, 1992 progress note states that Ferguson "feels he is coming to terms [with] where he 'is,' [and] plans to accept his attorney's recommendation." AR 396. Another call was placed to Ferguson's attorney that day. *Id.* The next day, January 17, 1992, hospital staff made the following progress note:

> "Extensive meeting/discussion with [Ferguson's] attorney [and Ferguson] at end of day; Clearly [Ferguson] stable at this point [and] does not need to be in hospital. He understands what he is up against, will take a [Chapter] 10 if he can, [and] will come to my office on Tues[day] for a [follow-up] appointment.

[Ferguson] is not suicidal, homicidal or in any other way a danger."

AR 397.

Ferguson was discharged from the hospital on January 17, 1992, having been diagnosed with "Adjustment Disorder with Anxiety and Depression," and "Character Disorder." AR 372. His physician described him as having "much legal difficulties but 'conventionally' intact." AR 398. At a follow-up appointment, Ferguson maintained that his goal was "to have my situation justified and stay in the army." AR 382. According to a clinical record prepared on January 22, 1992, Ferguson "constantly talks about the need to return to his job as soon as possible." *Id.*

On January 29, 1992, Ferguson was readmitted to the hospital for suicidal ideations. AR 383, 385. Once again, Ferguson "emphatically denie[d]" the sexual harassment charges. AR 383. On January 30, 1992, Ferguson's attending psychologist, Dr. David Ruhland, typed the following note into a progress report:

> [Ferguson's] councilor (lawyer), Mr. Cohen, met with me and we discussed [Ferguson] signing documents to have [him] released from the US Army. I advised councilor that at this time it was not advisable because [Ferguson] is not competent enough to sign any forms or documents. In fact, [Ferguson] is very stressed out and very depressed. Councilor assured me that he wouldn't bring up any subject about any charges or documents. Councilor and [Ferguson] met in visitors room along with a volunteer of the H600 ward. After Mr. Cohen left, volunteer informed me that councilor had [Ferguson] sign some documents. I then called [Ferguson's] CO and informed him of this. CO replyed [sic] "I'll look into this first hand." I talked with [Ferguson] after the CO and [Ferguson] had no response to any question I asked.

AR. 401. Ferguson was released on January 30, 1992, with diagnoses of adjustment disorder and character disorder. AR 73, 390.

Ferguson requested a discharge in lieu of court-martial either during his January 29-30, 1992 hospitalization or shortly after. AR 74-75. The undated request letter signed by Ferguson contained an affirmation that he was making the request "of [his] own free

will," not subject "to any coercion whatsoever by any person." AR 74. In the letter, Ferguson admitted guilt to the charge of adultery. *Id.* The discharge was approved on February 4, 1992, and Ferguson received an "other than honorable" discharge on February 11, 1992. AR 525, 535.

### C. Ferguson's Pre-2008 Appeals

On April 21, 1998, Ferguson applied to the Army Discharge Review Board (ADRB) seeking an upgrade to "honorable" discharge, on the grounds that he was innocent of the charges and that his state of mind prevented him from knowingly signing the Chapter 10 request for discharge in lieu of court-martial. AR 467-68.

On September 18, 1998, the ADRB upgraded the discharge to a "general" discharge. AR 218. The ADRB determined that, in light of Ferguson's service record, "the quality of [Ferguson's] service did not warrant" an "other than honorable conditions" discharge. AR 216. However, the ADRB did not alter the reason for the discharge, and concluded that "after consulting with defense counsel, [Ferguson] voluntarily, and in writing, requested separation from the Army in lieu of trial by court-martial." *Id.*

Ferguson also filed an application with the ABCMR to revoke his discharge. AR 231. As grounds for the correction, Ferguson stated that he was "bewildered and confused" at the time of the discharge, and signed whatever documents were put before him. *Id.* The ABCMR denied the application on May 5, 1999. AR 188-91. Reviewing Ferguson's military record and the relevant documents, the Board concluded that Ferguson's Chapter 10 request "was administratively correct and in conformance with applicable regulations," and that Ferguson had submitted "no evidence to show he was

coerced into requesting discharge or that he was not in his right mind when he did so."
AR 190.

On September 1, 1999, Ferguson applied for reconsideration of the ABCMR's May 1999 decision. AR 160. In support of his contention that he lacked the mental capacity to sign the Chapter 10 discharge request, Ferguson submitted medical records from his hospitalization. *Id.* The ABCMR denied Ferguson's application for reconsideration on May 17, 2000. AR 159. The Board acknowledged Dr. Ruhland's January 30, 1992 letter, but determined that "there is insufficient evidence to conclude that [Ferguson] was not mentally competent to sign whatever he signed on 30 January 1992 or that he was incapable of making an informed decision whenever he signed his request for discharge." AR 158. The ABCMR reviewed the circumstances of the visit by Ferguson's lawyer on January 30, 1992, and found it "improbable" that "a mental health professional would have allowed any meeting to occur if the applicant was not actually competent." *Id.* The Board also deemed it "unlikely that such a professional would have emphasized how bad off such an incompetent patient was by writing 'In fact PT is very stressed out.'" *Id.* The Board also noted that Ferguson was released following his attorney's visit, despite refusing to answer Dr. Ruhland's questions. *Id.* Finally, the Board highlighted a progress note from January 17, 1992, illustrating that Ferguson "had, even that early, already made a decision to request discharge for the good of the service to avoid trial by court-martial." *Id.*

### D. Ferguson's 2008 Appeal and Request for Reconsideration

On July 8, 2008, Ferguson again applied to the ABCMR, requesting that his

discharge be changed to a medical retirement.[1] AR 127, 141. Along with the application,

Ferguson submitted a certificate reflecting the upgrade to "general" discharge, his

medical records, a 2006 disability rating from the Department of Veterans Affairs (VA),

and a 2006 letter from the VA. AR 129-30. The medical records reflected that, since

1999, Ferguson had been treated for bipolar disorder with psychotic features. AR 129.

The VA letter contained a notice to Ferguson that he had been deemed incompetent to

handle his own financial affairs. AR 130.

On December 3, 2008 the Board again denied Ferguson's application. AR 131. In

its decision, the Board acknowledged that Ferguson had been diagnosed with bipolar

disorder and treated for that disorder since at least 1999. *Id.* But, the Board explained,

Ferguson's discharge occurred in 1992, at which time he had only been diagnosed with

adjustment disorder, depression, and personality disorder. *Id.* There was no evidence to

show that Ferguson could not perform his military duties during his term of service. *Id.*[2]

The Board again acknowledged Dr. Ruhland's January 30, 1992 progress note, in which

Dr. Ruhland stated that Ferguson was not competent to sign any forms or documents at

that time, but the Board still found "no other evidence of record (e.g., what tests were

performed) to show that [Ferguson] was mentally incompetent or to show that he could

not distinguish right from wrong." AR 130-31. The Board also noted that Ferguson's

treating psychologist could have initiated a formal evaluation of Ferguson's mental

status, but apparently did not feel so strongly about Ferguson's mental incompetency to

do so. AR 131.

---

[1] Converting his discharge to a medical retirement would require a showing that Ferguson was medically unfit at the time of discharge.
[2] Ferguson was not on active duty at the time of his hospitalization, because his commanding officer had relieved him for cause in May 1991. AR 599. The cause was not medical in nature, but rather the "various acts of indecent language and assault against female soldiers who worked for [Ferguson] at the dining facility." *Id.*

The Board relied upon an advisory opinion from Gilbert Teague, a medical advisor with the Army Review Boards Agency. AR 133. Teague reviewed Ferguson's medical records, and concluded that Ferguson was not diagnosed with bipolar disorder until after he had been out of the Army for several years. *Id.* Teague also determined that Dr. Ruhland's January 30, 1992 note did not establish that Ferguson had been deemed mentally incompetent during his hospitalization or prior to discharge. *Id.* Teague observed that Dr. Ruhland's "language is such that he implies that his patient is too distraught" to sign papers, not that Ferguson was mentally incompetent. *Id.* Finally, Teague noted Dr. Ruhland's use of the phrase "not advisable" with respect to communicating with Ferguson, and Dr. Ruhland's description of Ferguson as "stressed out and very depressed." *Id.* According to Teague, these statements were inconsistent with statements that a doctor would make about a mentally incompetent patient. *Id.* As a result, Teague found the pre-discharge medical records insufficient to establish that Ferguson was medically unfit at the time of discharge. *Id.*

Ferguson immediately applied for reconsideration of the December 3, 2008 decision. The Board returned the request without action on May 13, 2009, because Ferguson failed to provide any new evidence or argument with the request. AR 92.

On December 16, 2009, Ferguson submitted another request for reconsideration of the December 3, 2008 decision. AR 19. Ferguson asked the ABCMR to set aside his 1992 discharge and award him honorable disability retirement with back pay for bipolar disorder. AR 24. In the alternative, he requested that the Board set aside his discharge, place him on disability with a 70 percent rating, and award him back pay. *Id.* If the Board declined to place Ferguson on the disability list, Ferguson requested that the Board set

aside the discharge, grant back pay, and grant early retirement under the Temporary Early Retirement Authority (TERA), or grant him benefits under the Special Separation Benefit Program (SSB). Finally, in the event that the Board declined to grant any of those remedies, Ferguson requested back pay to the expiration of his time in service (ETS) and alteration of the narrative reason for his discharge to "expiration of time in service." *Id.*

In support of his application, Ferguson submitted a new medical report from a psychiatrist, and statements from a former supervisor and a former coworker. AR 6-7. Ferguson offered the psychiatrist's report to support his contention that he lacked competency when he signed the request for discharge in 1992, and to establish the existence of his bipolar condition as early as 1993. AR 23.

The Board considered Ferguson's application for reconsideration on September 28, 2010, and denied it on October 1, 2010. AR 1. After reviewing the facts established in the previous decisions, the Board turned to Ferguson's new evidence. AR 14. The Board observed that, according to the new psychiatrist's report, Ferguson was anxious, depressed and suicidal in 1992, "but it was not yet clear that he was disabled." *Id.* He had been "fully functional" until he was hospitalized. *Id.* It was not until later that Ferguson's condition "progressed to the bipolar diagnosis." *Id.*

Even considering the psychiatrist's report, the Board found that "the evidence does not indicate [Ferguson] was unfit at the time of his separation in 1992 or had any disabling condition which would have warranted referral for disability processing." AR 15. The statements from Ferguson's coworkers illustrated Ferguson's "irrational behavior and personal problems with other employees" during the relevant period, but the Board deemed these statements "insufficient as a basis on which to grant the relief requested."

AR 15-16.

The Board emphasized that although the ADRB upgraded Ferguson's discharge in 1998 "based on his overall military service," this "does not have any impact on [Ferguson's] request for a medical retirement." AR 14. Nor did the VA's subsequent disability rating have a retroactive effect. Because the VA "is not required to determine fitness for duty at the time of separation," and "[t]he Army must find a member physically unfit before he can be medically retired or separated," the VA's 2006 disability rating for bipolar disorder had limited relevance to Ferguson's request. *Id.* For these reasons, the Board denied Ferguson's application for medical retirement. AR 15.[3]

Ferguson had also repeated his claim that his mental state prevented him from voluntarily signing the Chapter 10 discharge request. The Board's findings and conclusions on this question dovetailed with the Board's analysis of Ferguson's fitness for duty as of 1992. To wit, the Board noted that Ferguson "was described as not being suicidal or homicidal, somewhat depressed, and his thought process was intact." AR 14. The Board concluded, "in the absence of evidence to the contrary," that Ferguson's discharge was administratively correct and in conformance with applicable regulations. AR 15. It determined that Ferguson's service record "does not contain any indication that the request for discharge was made under coercion or duress." *Id.*

### E. The Present Suit

Ferguson brought suit in 2012, seeking judicial review of the Board's October 1, 2010 decision. He argues in his motion for summary judgment that the ABCMR's

---

[3] The Board denied Ferguson's request for TERA relief on the ground that he had not served a sufficient number of years, and denied SSB relief because Ferguson never applied for a voluntary discharge under the SSB program, as required. AR 14. The Board also denied Ferguson's request for back pay up until his ETS date, and Ferguson's request for a change in the narrative reason of his discharge to "ETS," on the ground that Ferguson was separated prior to fulfilling his service obligation – *i.e.* he did not complete his term of service. *Id.*

decision was an erroneous application of law and facts. Defendant moves to dismiss under Fed. R. Civ. P. 12(b)(1) on the ground that Ferguson's claim is barred by the APA's six-year statute of limitations. In the alternative, Defendant moves for summary judgment on the ground that the ABCMR's decision was rational and is entitled to deference.

## II.     Legal Standard

### A.  Rule 12(b)(1)

When a party files a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), "the plaintiff[ ] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 176 (D.D.C. 2004). The court must accept as true all factual allegations in the complaint, and "may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### B.  Rule 56 Motions in APA Proceedings

Fed. R. Civ. P. 56 provides for entry of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of a final agency action under the APA, the normal summary judgment standard does not apply. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006). Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* at 90. "Summary judgment

thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

Federal courts review final decisions of military corrections boards, including the ABCMR, under the APA standard. *See Musengo v. White*, 286 F.3d 535, 538 (D.C. Cir. 2002). A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.*

## C. Review of ABCMR Decisions

"The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Courts review such decisions under an "unusually deferential application of the 'arbitrary and capricious' standard of the APA." *Musengo*, 286 F.3d at 538 (citing *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)). "While the broad grant of discretion implicated here does not entirely foreclose review of the Secretary's action, the way in which the statute frames the issue for review does substantially restrict the authority of the reviewing court to upset the Secretary's determination." *Kreis*, 866 F.2d at 1514. The statute authorizes the Secretary

to correct records "*when the Secretary considers it necessary* to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1) (emphasis added). "It is simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act *'when he considers it necessary* to correct an error or remove an injustice'…than if he is required to act whenever a court determines that certain objective conditions are met, i.e., that there has been an error or injustice." *Kreis,* 866 F.2d at 1514.

The substantial deference afforded military board decisions "is calculated to ensure that the courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings," which would have the potential to "destabilize military command and take the judiciary far afield of its areas of competence." *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000).

The district court is not to function as a "super correction board." *Charette v. Walker,* 996 F. Supp. 43, 50 (D.D.C. 1998). A decision by the ABCMR is not arbitrary and capricious if it "minimally contains a rational connection between the facts found and the choice made." *Frizzelle v. Slater,* 111 F.3d 172, 176 (D.C. Cir. 1997). The standard of review "does not require a reweighing of the evidence, 'but a determination of whether *the conclusion being reviewed* is supported by substantial evidence.'" *Walker v. Shannon,* 848 F. Supp. 250, 255 (D.D.C. 1994) (quoting *Heisig v. United States,* 719 F.2d 1153, 1157 (Fed. Cir. 1983) (emphasis in original)).

## III. Analysis

In essence, Ferguson makes two arguments: (1) that his mental problems, which ultimately developed into bipolar disorder, made him unfit for duty as of January 1992, and thus he was entitled to medical retirement; and (2) that those same mental problems, as evidenced by

medical records from his periods of hospitalization, prevented him from voluntarily signing the

Chapter 10 discharge request.[4] Neither argument prevails, because the Board applied the correct

standard of law and based its decision on substantial evidence in Ferguson's medical record.

## A. The Board Rationally Determined that Ferguson Was Not Entitled to Medical Retirement

The new evidence Ferguson presented with his July 8, 2008 application for record

correction was related only to Ferguson's post-discharge medical history. It consisted of a

2006 VA disability rating and a 2006 VA letter, both of which concerned Ferguson's

post-discharge bipolar diagnosis. AR 129-30. The Board discounted this evidence,

properly concluding that Ferguson's entitlement to a medical retirement depended on his

condition at the time of discharge, not his subsequent diagnoses. AR 130-31. At the time

of discharge, January 1992, Ferguson had been diagnosed with depression and anxiety

associated with an adjustment disorder, as well as a personality disorder. AR 130. But

there was little or no evidence that he was unfit to perform his duties because of his

mental condition. *Id.*

The Board expressly considered Dr. Ruhland's January 30, 1992 statements

describing Ferguson as stressed out, depressed, and not competent to sign any documents.

AR 130-31. According to the Board, this was insufficient on its own to establish that

Ferguson was medically incompetent or unfit for service, and there was "no other

evidence of record" to support Ferguson's claim. AR 131. In reaching these conclusions,

the Board sought an advisory opinion from Teague, who reviewed Ferguson's records,

---

[4] Ferguson does not address in his briefs the other claims he made in his December 16, 2009 application for reconsideration – including claims under TERA, SSB, and his request that the Board change the reason for his discharge to "ETS." Nor are these matters addressed in the Complaint. Therefore, the Court assumes that he is not seeking review of the Board's decision on those questions, or that he has conceded that the Board met the APA standard as to those issues.

including Dr. Ruhland's note. AR 133. After parsing Dr. Ruhland's note, in connection with Ferguson's medical records, Teague concluded that "there is no suggestion in the record that [Ferguson] was medically unfit." *Id.*

The medical records support the conclusions reached by Teague and the Board. They show that during his hospitalizations Ferguson was alert and cooperative (AR 377-79, 406), with an "intact" thought process (AR 398, 406), that he had experienced suicidal thoughts but denied having them at the time he was questioned by hospital staff (AR 377-78), and that he understood both the charges he was facing and his ability to request a discharge under Chapter 10 (AR 377-78, 383, 395-97).

The evidence Ferguson submitted with his December 16, 2009 application for reconsideration – a psychiatrist's report and statements from two coworkers – was more relevant to the time period at issue, but it did not change or overcome the Board's conclusion with respect to Ferguson's fitness for duty. The Board considered the psychiatrist's report, noting that the psychiatrist himself determined that, as of 1992, it was not yet clear that Ferguson was disabled, and Ferguson's condition only later progressed to a bipolar diagnosis. AR 14. The Board also considered the statements from Ferguson's coworkers, reasonably finding that a coworker's description of irrational behavior and interpersonal problems is insufficient basis for a grant of medical retirement. AR 15-16. Though the Board did not interpret the new evidence as Ferguson likely hoped it would, the Board's consideration was rational in light of the other evidence in the record.

In sum, the Board's decision concerning Ferguson's eligibility for medical retirement "contains a rational connection between the facts found and the choice made,"

*Frizelle,* 111 F.3d at 176, and is "supported by substantial evidence." *Walker,* 848 F.

Supp. at 255. Particularly in light of the "unusually deferential" APA standard applicable

to ABCMR decisions, *Musengo*, 286 F.3d at 538, the Court declines to upset the Board's

decision.

### B. The Board Applied the Correct Standard of Law and Relied on Substantial Evidence in Determining that Ferguson's Chapter 10 Request Was Voluntary

#### 1. The Board Applied the Correct Standard of Law

Ferguson argues that the Board applied the wrong legal standard when it required proof

of mental incompetence. Citing *Robinson v. Resor*, 469 F.2d 944 (D.C. Cir. 1972) and

*Krzeminski v. United States*, 13 Cl. Ct. 430 (1987), he asserts that a Chapter 10 request may be

ineffective even if the service member is not found mentally incompetent. According to

Ferguson, the court must look to whether the request was "voluntary, knowing, and intelligent,"

and made with "sufficient awareness of the relevant circumstances and likely consequences."

*Krzeminski*, 13 Cl. Ct. at 438 (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).

Defendant argues that the Board applied the correct standard, citing *Warren v. United

States*, 41 F. App'x 408 (Fed. Cir. 2002). The Court in *Warren* held that "[a] request for

discharge is presumed to be voluntary…but an otherwise voluntary request may be rendered

involuntary if the claimant failed to understand the voluntariness of his actions due to mental

incompetence." *Id.* at 410 (citing *Scharf v. Dep't of the Air Force*, 710 F.2d 1572, 1574 (Fed.

Cir. 1983)).

*Warren v. United States* supplies the correct legal standard. The case concerned an army

reservist (Warren) who went AWOL for several months. *Id.* at 409. A mental status evaluation

conducted prior to Warren's induction into service indicated that Warren's condition was

normal, but noted a "blunted and flat affect." *Id.* When Warren returned from his absence he

consulted with legal counsel, requested a Chapter 10 discharge, and received an "other than honorable" discharge. *Id.* He was subsequently diagnosed with paranoid schizophrenia. *Id.* Warren applied to the ADRB and the ABCMR for a discharge upgrade, alleging that he suffered from schizophrenia at the time he made the Chapter 10 request. *Id.* Warren sought relief in the Court of Federal Claims, but the court dismissed his claim for correction of records and back pay, finding that his discharge was voluntary. *Id.*[5]

Thus, on appeal, the issue before the Federal Circuit was whether Warren's discharge request was voluntary. The Federal Circuit stated that "[a] request for discharge is presumed to be voluntary…but an otherwise voluntary request may be rendered involuntary if the claimant failed to understand the voluntariness of his actions due to mental incompetence." *Id.* at 410.

Warren argued that he had exhibited a flat and blunted affect upon induction, which is a symptom of schizophrenia, that he had interpersonal problems at the time of discharge, and that he was diagnosed with schizophrenia within one year of the discharge. *Id.* at 410. However, the court deemed Warren's request voluntary because "the record did not establish that [Warren] suffered from a mental condition that prevented him from understanding the consequences of requesting a discharge, particularly when faced with the alternative of trial by court martial." *Id.* at 410. There was "no psychiatric diagnosis made at the time, and Mr. Warren presented no evidence that his condition was sufficient for a diagnosis of schizophrenia." *Id.* Warren's later diagnosis of schizophrenia "[did] not demonstrate that he suffered from this condition at the time of his discharge or that his alleged condition was severe enough to render his actions involuntary." *Id.*

The *Warren* case flows from a long line of related cases dealing with the voluntariness of

---

[5] The Court of Federal Claims lacks jurisdiction to decide claims related to a military discharge if the discharge was voluntary. *See Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999).

a service member's request for discharge. *See, e.g.*, *Manzi v. United States*, 198 Ct. Cl. 489, 505 (1972) (recognizing an involuntary resignation where the plaintiff was not "capable of completely understanding his act; he was under extreme emotional pressure which interfered with his clear thinking and this could have affected a sound judgment for his future, by reason of being under the particular disorder"); *McEntee v. United States*, 30 Fed. Cl. 178, 184 (Fed. Cl. 1993) *aff'd*, 39 F.3d 1197 (Fed. Cir. 1994) (finding a voluntary discharge where plaintiff had seen a psychotherapist for "severe depression, despair, and suicidal thoughts," but there was no evidence that plaintiff's mental capacity "rendered him unable to make a competent decision"); *Gallucci v. United States*, 41 Fed. Cl. 631, 642-43 (Fed. Cl. 1998) (a plaintiff's assertion of "severe mental stress and anxiety" was insufficient on its own to show that the plaintiff "was in any way incapable of exercising free will or understanding his actions"); *Scarseth v. United States*, 52 Fed. Cl. 458, 476 (Fed. Cl. 2002) (finding resignation voluntary where there was "no evidence that plaintiff was rendered unable to competently decide whether to resign," and where plaintiff had "failed to show that he was mentally incompetent at the time he submitted his resignation"); *Sinclair v. United States*, 66 Fed. Cl. 487, 494 (Fed. Cl. 2005) *aff'd*, 192 F. App'x 966 (Fed. Cir. 2006) (finding plaintiff's allegations of "tremendous emotional strain" insufficient to show that he was "incapable of understanding his actions at the time he resigned").

These cases all stand for the proposition that great mental stress, emotional strain, or diagnoses of anxiety, depression, and the like, are insufficient to show that a service member lacked the capacity to voluntarily request a discharge. Under *Warren* and the above-cited cases, a service member must show that his mental state prevented him from understanding the meaning and consequences of his actions.[6]

---

[6] The standard articulated in *Krzeminski*, which Ferguson cites, reflects only the general standard applied by courts to determine whether a criminal defendant voluntarily waived the right to jury trial. *See Krzeminski*, 13 Cl. Ct. at

*Robinson v. Resor* is distinguishable. That case concerned a service member (Robinson) whose wife operated two motels and cared for the couple's minor children. 469 F.2d at 946. Robinson's wife became ill and suffered frequent hospitalizations, leading Robinson to apply for an honorable discharge. 469 F.2d at 946. Robinson's commanding officer did not forward the request up the chain of command, in violation of army regulations, because the commanding officer did not want to lose him. *Id.* When Robinson's wife entered the hospital again for surgery, Robinson requested leave to attend to the motels and childcare, but was granted inadequate time to arrange his affairs. *Id.* Robinson then spent the next three weeks willfully and knowingly absent without leave (AWOL). *Id.* During that period, he returned to base and withdrew $100.00 from the disbursing office. *Id.* at 946-47.

Upon returning to base, Robinson was charged with being AWOL for 20 days, larceny of the $100.00, and making a fraudulent claim for payment during a period of absence without leave. *Id.* at 947. The "mental strain" resulting from his wife's illness, his business problems, and the charges caused Robinson to suffer a nervous collapse. *Id.* While under psychiatric care, Robinson signed a letter of resignation for the good of the service, and received an "other than honorable" discharge. *Id.* He subsequently applied to the ADRB to set aside his discharge and recover back pay, but the ADRB denied the request. *Id.* at 945.

In reversing the ADRB's decision, the *Robinson* court determined that the case "was lacking…both procedural due process and substantive justice." *Id.* at 949. The court emphasized the "unacceptably narrow focus of the Board's inquiry." *Id.* at 946. Though the court accepted the Board's findings that Robinson was "legally competent" and that "there was no outright coercion," the court criticized the Board's "refusal…to weigh the other pressures which

438. *Krzeminski* did not concern a voluntary discharge, but rather a waiver of certain administrative remedies. *See id.* at 435-36. By contrast, the standard articulated in *Warren*, and the line of cases from which it flows, is specific to voluntary discharges of service members.

obviously affected the soundness of Robinson's judgment." *Id.* at 950. Robinson was "officially certified sane" when he left psychiatric care, but "he was also clearly acting unwisely and under pressures that had recently threatened even his grip on reality." *Id.* The court stated that it "[could not] condone the Board's determined effort to overlook the fact that Robinson's earlier request for a discharge under honorable conditions had not been properly forwarded," because "[i]f it had been, the unfortunate predicament which led to his second resignation might never have arisen." *Id.*

Thus, *Robinson* is both legally and factually inapposite. Robinson's discharge was deemed involuntary as much because of the procedural defects as the substantive issues, and the court based its remand in large part on the ADRB's failure to consider certain crucial evidence. *See id.* at 946 (noting the "unacceptably narrow focus of the Board's inquiry"), 950 (accusing the ADRB of a "total failure to consider" whether the charges were substantiated).

Unlike the ADRB in *Robinson*, the ABCMR here carefully considered the totality of the record before it, and sought an advisory opinion to interpret Ferguson's medical record. Furthermore, the language used by the Board shows that its inquiry was in line with the standard set forth in *Warren*. The Board's December 3, 2008 decision found "no other evidence of record (e.g., what tests were performed) to show that [Ferguson] was *mentally incompetent* or to show that he could not distinguish right from wrong." AR 131 (emphasis added). When the Board denied Ferguson's application for reconsideration in 2010, it acknowledged *Robinson* but stated that "each case is decided on its own merits." AR 14. The Board reconsidered Ferguson's mental competence in light of the report from Ferguson's psychiatrist, but found no reason to change its decision. AR 14. In addition, the Board concluded that the Ferguson's service record "[did] not contain any indication that the request for discharge was made *under coercion or duress*." AR 15

(emphasis added). This language mirrors the standard set forth in *Warren* and the other cases in that line. *See Warren*, 41 F. App'x at 410. Thus, the Board's assessment of Ferguson's mental competence and consideration of coercion and duress was correct, appropriate, and "in accordance with law" under the APA. *See* 5 U.S.C. § 706(2)(A).

### 2. The Board's Decision is Supported by Substantial Evidence

While the question of whether Ferguson was medically fit for service differs from the question of whether he voluntary signed his Chapter 10 request for discharge in lieu of court-martial, the Board appropriately relied on the same evidence in deciding both. Ferguson argues that he was unable to sign the request due to his mental state. Therefore, evidence of his mental state in January 1992 is relevant to both his fitness for duty at the time of discharge and his competence to sign a Chapter 10 request.

As discussed above, the Board reasonably concluded that Ferguson was not mentally incompetent during his hospitalization, noting that his medical records describe him as depressed and anxious, but "intact" and aware of the charges and his legal options.

Ferguson relies heavily on the January 30, 1992 progress note from Dr. Ruhland, which stated that approaching Ferguson about the Chapter 10 discharge was "not advisable because [Ferguson] is not competent enough to sign any forms or documents." AR 401. Ferguson suggests that his attorney disobeyed Dr. Ruhland's warning and obtained the signature on the Chapter 10 request despite Ferguson's mental state.

Dr. Ruhland's note undoubtedly weighs in Ferguson's favor, but it is not conclusive. As Teague noted in his advisory opinion to the Board, the rest of the language in Dr. Ruhland's note is not consistent with how a doctor would likely describe a patient who was fully mentally incompetent. *See* AR 133. The phrase "not competent

enough to sign any forms or documents" is ambiguous, in light of Dr. Ruhland's contemporaneous statement that Ferguson was "very stressed out and very depressed." AR 401. Furthermore, as the Board noted, Ferguson was discharged that same day, and no other tests or formal evaluations of Ferguson's mental state were performed. *See* AR 130-31. This evidence militates against the conclusion that Ferguson's mental state prevented him from understanding his actions. Given the ambiguity, the Board reasonably looked to other evidence in Ferguson's medical record to determine his mental competence. The other evidence indicated that Ferguson's mental state was intact, he understood the charges, and he understood that he had to request a Chapter 10 discharge or face trial by court-martial.[7] The Board was not required to accept Dr. Ruhland's statement as gospel in light of contrary evidence and contrary analysis from the Board's medical advisor.

The Board's decision is "supported by substantial evidence," *Walker,* 848 F. Supp. at 255, and there is a rational connection between the evidence that the Board's decision. As with the medical retirement claim, under the "unusually deferential" standard of review applicable in these cases the Court must conclude that the agency complied with the APA.

### C. Timeliness of Ferguson's Claim

Defendant also moves to dismiss on the ground that Ferguson's suit is time-barred. Defendant argues that, although Ferguson challenges an ABCMR decision rendered on October 1, 2010, the Board actually decided the substance of Ferguson's claim in May 5, 1999, and Ferguson's application for reconsideration only tolled the statute until May 17, 2000. *See* AR

---

[7] The notes made by medical personnel during Ferguson's hospitalizations suggest that he may have vacillated some in deciding whether to request a Chapter 10 discharge or fight the charges at trial. *See* AR 377-78, 395-97. However, this is not an indication that he was incompetent to make or understand the decision.

159. Thus, under Defendant's theory, the six-year statute of limitations set forth in 28 U.S.C. § 2401 (which governs APA claims) gave Ferguson until 2006 to seek review of the Board's decision. Defendant contends that subsequent applications for reconsideration of the same decision, or subsequent repackaging of the claim as one for "medical retirement" or other relief, should not extend the limitations period.

Ferguson responds that his 2008 application for medical retirement was a different claim than his earlier applications, or, in the alternative, that the ABCMR effectively reopened his claim in its 2008 decision.

Despite the parties' diligent and thorough briefing on the subject, the Court need not decide this question. As discussed above, the Court concludes that the ABCMR acted rationally in denying Ferguson's request for reconsideration. Therefore, even assuming that Ferguson's 2008 application was timely, Defendant is entitled to summary judgment. A separate Order consistent with this Memorandum Opinion will issue.

August 14, 2014

_____

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE